# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Terrence Moore**, *et al.*,<br><br>                                Plaintiffs,<br><br>             -against-<br><br>**Navillus Tile, Inc., d/b/a Navillus Contracting**, *et al.*,<br><br>                                Defendants. | 14-CV-8326 (CM)(JLC) |
| **Thomas Gesualdi**, *et al.*,<br><br>                                Plaintiffs,<br><br>             -against-<br><br>**Navillus Tile, Inc., d/b/a Navillus Contracting**, *et al.*<br><br>                                Defendants. | 15-CV-08441 (CM)(JLC) |

## WITNESS STATEMENT OF DONAL O'SULLIVAN

1.   My name is Donal O'Sullivan.  I am the sole owner and President of Navillus Tile, Inc. ("Navillus"), a company I founded in 1987 with my brothers Kevin and Leonard a few years after we emigrated from Ireland to the United States in pursuit of a better life.

2.   Over the past 30 years, Navillus has grown from a small tile contractor with no employees performing small remodeling jobs in private residences into one of the largest union construction firms in New York City, performing various trades on some of the City's largest and highest profile public and commercial union construction projects, such as the redevelopment of the World Trade Center site.

3.   Navillus primarily serves as a subcontractor doing masonry, concrete, stone, tile, steel, restoration, repointing, roofing, carpentry, electrical, plastering, and fireproofing

work on large union construction projects.  Additionally, Navillus works a prime and general contractor on public restoration jobs where it self-performs the majority of the work.

    4. Work for public entities (as opposed to private developers and property owners) accounts for a substantial portion of Navillus revenues and all of Navillus' general contracting work.  And Navillus' masonry work and concrete superstructure projects comprise a majority of Navillus revenues.  Navillus is one of the largest masonry subcontractors in the City, work that typically involves the construction of brick facades on new buildings or the historic restoration of existing brick buildings.  Navillus' concrete superstructure work, as distinguished from concrete foundation work, involves the pouring of concrete floors and columns on high-rise buildings.

    5. A union shop since 1989, Navillus employed over 1,600 union workers in 2016.  Navillus workers are members of the following unions:

  (a) Bricklayers and Allied Craftworkers, Local 1;
  (b) Bricklayer and Allied Craftworkers, Local 7 (formerly Marble Carvers, Cutters & Setters Union of NY & NJ, Local 4; Marble Finishers Union of NY, Local 20; Tile Setters Union of NY & NJ, Local 52; and Tile Finishers of NY, Local 88).
  (c) NYC District Council of Carpenters, Locals 157 and 1556;
  (d) Laborers International Union of North America ("LIUNA") Cement & Concrete Workers of New York City (Laborers' Locals 6A, 18A, and 20 Concrete Workers);
  (e) Cement Masons, Local 780;
  (f) International Union of Operating Engineers, Locals 13, 15, 138;
  (g) LIUNA Local 731 (Excavators);
  (h) LIUNA (Laborers) Local 66;
  (i) LIUNA Construction and General Building Laborers' (Mason Tenders) Local 79;
  (j) Metallic Lathers and Reinforcing Ironworkers, Local 46;
  (k) Plasterers, Locals 1 and 262;
  (l) Pointers, Local 1;
  (m) Ironworkers Local 197 Stone Derrickmen & Riggers;
  (n) Stone Setter, Local 1;
  (o) Teamsters, Local 282;
  (p) LIUNA Laborers Local 1010 (Pavers);
  (q) Ironworkers, Local 580; and
  (r) Locals 14, 15, 15A, and 15D (Operating Engineers and Surveyors)

NAVILLUS_000091936

6. ==Navillus is also obligated to abide by the terms of project-specific collective bargaining agreements, known as Project Labor Agreements, which may cover members of the unions listed above as well as workers from other trades.==

7. Plaintiffs in this case are trustees of jointly administered Taft-Hartley trust funds for the following unions whose members perform work for Navillus on concrete superstructure projects: Metallic Lathers Local 46, Cement and Concrete Workers, Cement Masons Local 780, the District Council of Carpenters, and Teamsters Local 282.

8. Navillus is one of the biggest contributors to Taft-Hartley funds in New York City, paying tens of millions of dollars to these funds every year.

9. Navillus has paid over $172 million in contributions to benefit funds from calendar years 2011 through 2016, including over $83 million to the Plaintiff funds during that time period. Navillus made nearly $35 million in fund payments in calendar year 2016 alone, a 40% increase over the nearly $25 million in fund contributions made in 2011. From calendar years 2011 through 2016, Navillus has made over $12.5 million in payments to the Local 46 funds, nearly $29 million in payments to the Cement and Concrete Workers' funds, over $4.5 million in payments to Local 780 funds, over $35 million in payments to the Carpenters' funds, and over $1.5 million in payments to the Local 282 funds. (See DX 36, Fund Contributions.)

| Union | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total paid |
|---|---|---|---|---|---|---|---|
| Carpenters - Local 157, 1556 | $3,675,180.80 | $4,888,682.46 | $5,571,935.60 | $3,958,559.78 | $10,706,323.47 | $6,349,703.06 | $35,150,385.17 |
| Cement & Concrete Laborers | $2,458,223.07 | $4,147,155.07 | $5,711,150.00 | $3,574,736.79 | $7,141,343.80 | $7,475,593.85 | $28,935,656.44 |
| Cement Masons - Local 780 | $408,663.14 | $213,877.75 | $548,820.72 | $632,668.71 | $1,188,423.17 | $1,872,923.12 | $4,865,376.61 |
| Metal Lathers - Local 46 | $699,114.21 | $1,680,908.78 | $2,661,968.03 | $985,349.16 | $4,687,942.43 | 2,894,102.42 | $12,709,710.08 |
| Teamsters - Local 282 | $207,592.95 | $312,473.82 | $278,286.35 | $161,040.91 | $199,088.96 | $433,244.86 | $1,591,727.85 |
| Total | $7,448,774.17 | $11,243,097.88 | $14,772,160.70 | $9,312,355.35 | $23,923,121.83 | $19,025,567.31 | $83,252,856.15 |

NAVILLUS_000091937

*Navillus Today*

28.     I am currently the sole owner, President and Chief Executive Officer of Navillus, which has been under my sole direction since 2006.  (See DX 007, Board Minutes.)

29.     When we started Navillus, Kevin, Leonard, and I each owned a third of the company.

30.     In 1998, Leonard left Navillus to move to Florida, leaving me and Kevin each with 50% ownership of the company.

31.     Kevin served as Vice President of Navillus until he resigned from that role in 2006 when he created Time Square.  Time Square is a non-union general contractor on private, ground-up construction projects.

32.     Since he resigned from Navillus, Kevin has played no part in the management, supervision, or direction of Navillus' business operations, nor has he had any input or discretion over Navillus' hiring practices, labor relations, or the terms and conditions of employment of Navillus employees.

33.     Kevin sold me his 50% interest in Navillus in January 2015 for $10,970,200.  (See DX 41, 150 Sale Documents.)  Kevin's insistence that I buy out his share of Navillus was the direct result of this lawsuit and previous legal proceedings involving the unions.  Simply put, Kevin had not had any input in the management or direction of Navillus in nearly a decade, and the mental and financial strain of dealing with one legal issue after another convinced Kevin that selling his equity interest in Navillus was best for him and Time Square.

34.     Currently, Navillus' board members are Peter Downes, Colin Mathers, Saleem Asmed, and myself.

NAVILLUS_000091942

35. In addition to myself and Downes, who is Chief Estimator, Navillus' executive employees are Financial Controller Padraig Naughton, and Director of Operations Colin Mathers.

36. My sister Helen O'Sullivan is the head of the payroll department at Navillus. In this role, she oversees at least two employees who are responsible for processing payroll checks for Navillus employees. Helen also prepares and after review and approval by our Director of Operations signs the payroll remittance reports and pays the necessary benefits. Helen is not responsible for any business, operations, or financial decisions at Navillus.

37. Although Eoin Moriarty, Patrick Corcoran, Hazelyn Corcoran, John Kuefner, and Willie O'Donnell all worked for Navillus at one point or another, none of these individuals has ever held any ownership interest in or been an officer or executive of Navillus.

*Navillus' Work*

38. As described above, Navillus performs various types of work as a subcontractor and prime or general contractor.

39. In total, subcontracting work accounted for over 83% of all Navillus revenues from calendar year 2011 through the end of 2016. From calendar year 2011 through the end of 2016, masonry subcontracts accounted for about 18% of all Navillus revenues. From calendar year 2011 through the end of 2016, concrete subcontracts accounted for over 49% of all Navillus revenues. Revenues from this type of work have grown from over $24 million in calendar year 2011 (or 16% of revenues) to over $124 million in calendar year 2016 (or 60% of revenues). (See DX 37, Contract Revenues.)

40. Navillus' concrete subcontracting revenues are primarily derived from its work building concrete superstructures. Navillus also performs other concrete work, such as renovating existing concrete structures and performing rebar work. However, Navillus performs

NAVILLUS_000091943

785 Fifth Avenue and 47 East 34th Street, I am not aware of any job where Navillus remained on an open-shop job.

*Navillus' Operations*

52.     Since 2015, Navillus has been headquartered at 633 Third Avenue, New York, NY, where it leases 12,000 square feet.  Previously, starting in December 2011, Navillus' headquarters were located at 575 Fifth Avenue, New York, NY.  Prior to 2011, Navillus also had headquarters at 53-18 11th Street in Long Island City and briefly at 460 Park Avenue in Manhattan.  Except for a very brief period of a few months in 2006 when Time Square was initially formed and Time Square leased space from Navillus for market value, Navillus does not share its facilities, equipment, supplies, or employees at either of these locations with Time Square, HDK, or ACS.  Navillus also leases space on First Street in Queens and previously had yards on Review Avenue in Queens and in Sayreville, NJ.  Navillus has never shared its facilities, equipment, or employees at either of these locations with Time Square, HDK, or ACS.  Navillus maintains its own telephone and computer systems.

53.     Navillus' annual general and administrative expenses have increased since ACS's formation, and during the time that both ACS and Time Square were allegedly the disguised continuance of Navillus, from $13,280,048 in 2013 to $15,189,584 in 2016.  (See DX 30-34, Financial Statements.)

54.     Navillus does not share with any other company, or pay on any other company's behalf, insurance policies, bank accounts, equipment, vehicles, labor, payroll systems, or professional services.  Navillus maintains its own books and records, files its own taxes, and has never comingled finances or transferred or received funds to or from Time Square,

NAVILLUS_000091947

HDK, or ACS, except for compensation for services rendered (such as Navillus' work as a subcontractor on two Time Square jobs detailed above) or the sale of equipment in arms' length transactions. Navillus does not provide any administrative services or support for Time Square, HDK, or ACS; Navillus has no involvement in any of these entities' bookkeeping, accounting, tax preparations, or other similar functions.

55. Navillus owns millions of dollars worth of construction equipment including a fleet of over 23 vehicles. Additionally, Navillus rents or leases a substantial amount of equipment from various rental companies depending on the needs of the company. From 2011 through 2016, Navillus made payments totaling over $280 million to more than 1,000 different vendors for the purchase or lease of equipment, materials, and services. (DX 39, Vendor Payments.) One such vendor is Manhattan Tool, an entity which I have owned since 2014 and which leases equipment to over 300 different construction companies in New York City.

56. From 2011 through the end of 2016, Navillus received revenues from roughly 450 different jobs through contracts with over 100 different clients. (See DX 37, Contract Revenues.)

57. From the time it was founded until today, Navillus has steadily grown its workforce over time, notwithstanding cyclical changes in the construction economy in New York. In 2015, Navillus employed 2,127 employees, an increase from the 1,515 employees Navillus employed in 2012. Roughly 98% of Navillus employees in 2015 were union tradesmen and women. At any given time, Navillus employs dozens of project managers and superintendents.

NAVILLUS_000091948

*Conclusion*

131. In spite of all of the union rhetoric, Navillus remains a viable and thriving construction company and a major player in the union concrete subcontracting market. Navillus continues to employ thousands of union workers and dutifully meet its obligations to the union funds.

132. It is true that I have helped my brother, Kevin O'Sullivan, and my former employee and confidant, Eoin Moriarty, as I have helped countless other family members, friends, and even relative strangers before.

133. However, I do not own Time Square and I have not even been a partial owner since 2012. And from the beginning, Time Square was Kevin's baby, not mine. He ran everything, as he does today, and I have never had much to do with it besides those few times when he did, in fact, ask for my help. And while it might have been easier for Kevin to do otherwise, Kevin kept Time Square completely separate from Navillus from the start.

134. I have never owned ACS either, nor have I ever had any role in its management or operations. When Eoin was just getting started, I happily helped him out because I had faith in him and his vision and because I wanted him to succeed.

135. I understand that to the unions, any help of any kind to anyone that is not signed up is considered a betrayal. I obviously do not share that perspective. But regardless of how they feel about my willingness to help my family and friends, the suggestion that it was motivated by some desire to avoid paying the benefits funds is simply false.

Dated: 7/7/17

DONAL O'SULLIVAN

NAVILLUS_000091965

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Terrence Moore, *et al.*, <br><br> Plaintiffs, <br><br> -against- <br><br> Navillus Tile, Inc., d/b/a Navillus Contracting, *et al.*, <br><br> Defendants. | | 14-CV-8326 (CM)(JLC) |
| Thomas Gesualdi, *et al.*, <br><br> Plaintiffs, <br><br> -against- <br><br> Navillus Tile, Inc., d/b/a Navillus Contracting, *et al.* <br><br> Defendants. | | 15-CV-08441 (CM)(JLC) |

### WITNESS STATEMENT OF HELEN O'SULLIVAN

**Background**

1. My name is Helen O'Sullivan. I currently reside at 3345 169th Street, Flushing, NY 11358, and I am employed by Navillus Tile, Inc. ("Navillus").

2. I am from Ballinskelligs, in the southern part of County Kerry, Ireland. I attended University College Dublin and obtained a Bachelor of Arts in 1978.

3. In 1989, I moved to the United States and joined Navillus where I worked with by brothers, Donal, Kevin, and Leonard, in an administrative capacity, essentially providing administrative support as needed.

**My Role at Navillus**

4. I am currently the head of the payroll department at Navillus, and I report directly to my brother, Donal. In this role, I usually oversee between two and three employees in

the payroll department who are responsible for processing payroll checks for all Navillus employees. Payroll is handled in-house at Navillus. I am not now nor have I ever been an officer of Navillus.

5. I prepare all remittance reports based on payroll reports generated from our accounting and software timberline. Some remittance reports are generated automatically form timberline and some are completed manually using the payroll reports from timberline. The remittance reports are reviewed and approved by our Director of Operations prior to me signing the reports and paying the benefits.

6. I have no responsibility for, or control over, any business, operations or financial decisions at Navillus. Nor do I have authority over hiring and firing.

Dated:

*[signature]*
HELEN O'SULLIVAN

-2-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Terrence Moore, *et al.*, <br><br> Plaintiffs, <br><br> -against- <br><br> Navillus Tile, Inc., d/b/a Navillus Contracting, *et al.*, <br><br> Defendants. | 14-CV-8326 (CM)(JLC) |
| Thomas Gesualdi, *et al.*, <br><br> Plaintiffs, <br><br> -against- <br><br> Navillus Tile, Inc., d/b/a Navillus Contracting, *et al.* <br><br> Defendants. | 15-CV-08441 (CM)(JLC) |

## WITNESS STATEMENT OF PADRAIG NAUGHTON

**Background**

1. My name is Padraig Naughton. I currently reside in Peter Cooper Village, New York, and I am employed by Navillus Tile, Inc. ("Navillus").

2. I am from Nenagh, County Tipperary, Ireland. I attended Athlone Technical College, from which I graduated in the early 1990s with a degree in accounting. I subsequently worked for the accounting firm Grant Thornton, also in Ireland.

3. In 1998, I relocated to the United States and obtained a job at Navillus with the help of my friend, a Navillus employee named Seamus Brislane. I was hired as a laborer, but after a few months I was offered a position in the accounting department. There, I reported to Leonard O'Sullivan, brother to Kevin and Donal O'Sullivan. I held that position for approximately one year. After that, I had various responsibilities within the financial department

NAVILLUS_000091966

and, ultimately, was promoted to financial controller, which is the position I have held for the last six years.

4. As financial controller, I report directly to Donal O'Sullivan, the President of Navillus, and occasionally to Colin Mathers, Director of Operations. (See DX 35 for Navillus' organizational charts.)

**My Responsibilities For Navillus**

5. As financial controller I oversee all accounting functions, including coordinating with external accountants Grassi & Company for income tax preparation and the creation of various financial statements. My duties include cash management functions and overseeing accounts payable, accounts receivable and cash disbursements.

6. My responsibilities also involve the company's banking and finance activities. These include reviewing financial contracts, financing agreements, leases and insurance policies.

7. I also review invoices for equipment, insurance, bonds, and other services along with related payment requisitions. I oversee some of Navillus' contracts and business dealings with vendors and other professional service firms. For example, I sometimes approve spending on equipment rentals and purchases, although this is primarily the responsibility of the individual project managers or purchasing department.

8. I oversee the preparation and maintenance of Navillus' financial books and records. (See DX 8, DX 30 to DX 34 for portions of Navillus' financial statements.)

9. Navillus maintains its own bank accounts (see DX 5, showing authorized signers), files its own taxes (see DX 2 and DX 148, Navillus' tax returns), and pays for all of its own insurance and professional financial services and does not share such with other companies.

NAVILLUS_000091967

Navillus does not pay for any other company's insurance, equipment, labor, or professional services. When asked to do so, I recommend to friends and acquaintances at other companies in the industry including various vendors, suppliers or services firms with which I am satisfied. These are recommendations, not directions, and they decide for themselves who to use and pay.

10. Navillus does not pay ACS's or Time Square's legal fees or other expenses related to this lawsuit.

11. Since the creation of ACS in 2013, Navillus has continued to pay tens of millions of dollars in general and administrative expenses:

| Fiscal Year | General and Administrative Expenses |
| --- | --- |
| 2013 | $13,280,048 |
| 2014 | $14,214,170 |
| 2015 | $13,900,556 |
| 2016 | $15,189,584 |

(See DX 30 to DX 33, Navillus' financial statements for fiscal years ended March 31, 2013 through 2016.)

**Navillus Contributes Hundreds of Millions To Union Funds**

12. Navillus is currently one of the largest union contractors in New York City. It has grown from approximately 100 employees when I joined in 1998 into a large and growing construction company with roughly 1,600 unionized employees and almost 200 non-unionized, managerial employees. In 2016, almost 30 of those managerial employees are full-time salaried employees working in our office at 633 Third Avenue. These employees work in accounting and payroll (all of which is all done in-house), drafting and estimating. We also have over ten project managers and assistant project managers and several field superintendents, and dozens of foremen who work on a project-by project basis.

NAVILLUS_000091968

13. Along with headcount, revenues have grown from over $145 million in fiscal year 2011 to over $240 million in fiscal year 2016. (See DX 30 to DX 34, Navillus' financial statements, and DX 37, showing contract revenues.)

14. As a union employer, Navillus is a member of the Building Contractors Association, Inc. ("BCA") and the Hoisting & Scaffolding Trade Association, Inc. ("HASTA"). Either through CBAs negotiated by BCA or HASTA on Navillus' behalf, PLAs, or Agreements directly between Navillus and the unions, over 1,600 union workers were employed by Navillus in 2016 and for whom Navillus pays benefits for.

15. As Navillus' workforce and revenues have grown, so too have its contributions to union pension funds. Navillus contributes tens of millions of dollars annually to the jointly administered Taft-Hartley trust funds that administer benefits for those trade unions to which Navillus pays benefits. Those unions, which include the plaintiffs in this case, are:

(a) Bricklayers and Allied Craftworkers, Local 1;
(b) Bricklayers and Allied Craftworkers, Local 7 (formerly Marble Carvers, Cutters & Setters Union of NY & NJ, Local 4; Marble Finishers Union of NY, Local 20; Tile Setters Union of NY & NJ, Local 52; and Tile Finishers of NY, Local 88).
(c) NYC District Council of Carpenters, Locals 157 and 1556;
(d) Laborers International Union of North America ("LIUNA") Cement & Concrete Workers of New York City (Laborers' Locals 6A, 18A, and 20 Concrete Workers);
(e) Cement Masons, Local 780;
(f) International Union of Operating Engineers, Locals 14, 15, 138;
(g) LIUNA Local 731 (Excavators);
(h) LIUNA (Laborers) Local 66;
(i) LIUNA Construction and General Building Laborers' (Mason Tenders) Local 79;
(j) Metallic Lathers and Reinforcing Ironworkers, Local 46;
(k) Plasterers, Locals 1 and 262;
(l) Pointers, Local 1;
(m) Ironworkers Local 197 Stone Derrickmen & Riggers;
(n) Stone Setter, Local 1;
(o) Teamsters, Local 282;
(p) LIUNA Laborers Local 1010 (Pavers);
(q) Ironworkers, Local 580; and
(r) Local 14, 15, 15A, and 15D (Operating Engineers and Surveyors)

NAVILLUS_000091969

16. In my role as financial controller, I have personal knowledge of Navillus' pension fund contributions. Since 2011, Navillus has contributed a total of $172,579,176.91 to these union pension funds, covering approximately 6,000 union workers:

| Calendar Year | Contribution to Pension Funds |
|---|---|
| 2011 | $24,732,143.80 |
| 2012 | $22,880,231.63 |
| 2013 | $29,332,580.54 |
| 2014 | $21,429,527.78 |
| 2015 | $36,662,892.27 |
| 2016 | $34,957,322.80 |
| Total: | $172,579,176.91 |

(See DX 36 showing Navillus' pension fund contributions.)

**Alter Ego Charges**

17. I have read the complaint in this case (and other documents) charging that certain companies (such as ACS and Time Square) were established and used by Donal or Navillus to avoid paying amounts due under CBAs signed by Navillus.

18. I have no knowledge whatsoever to support such accusations. Indeed, everything I know refutes such charges. Donal never discussed with me any plan to disguise dealings to avoid contributions to the funds. Other than a few arms-length market transactions (discussed below), I am not aware of anything of value ever being funneled from non-Navillus entities back to Donal (directly or indirectly, such as through another company). Despite my long tenure at Navillus, one that has made me privy to the company's finances and transactions

NAVILLUS_000091970

for all the years in question, I know nothing of a so-called alter ego scheme. Indeed, despite this supposed scheme, Navillus continued to make enormous contributions to the union funds.

19. Donal (and I), as a result of past accusations and lawsuits, have remained sensitive to corporate separateness, though we are not lawyers and do not employ an attorney in-house. I am not aware of any transfer of value from others to Donal or Navillus as a result of any non-Navillus project (such as Sugar Hill or Boston Road). Put simply, there is no basis for the plaintiffs' charges.

**Navillus' Facilities**

20. Navillus has always occupied its own premises and has not paid for premises used by ACS or Time Square. When I joined Navillus in 1998, the company was headquartered on 53-18 11th Street, Long Island City and maintained its yard there as well. In March 2010, Navillus moved to office space at 460 Park Avenue in Manhattan and rented (from an unrelated third-party) a new warehouse at 27-02 First Street, Astoria, Queens, a location it still maintains.

21. In December 2011, Navillus relocated from 460 Park Avenue to 575 Fifth Avenue and began subleasing a yard at 27-50 First Street in Astoria, Queens, from an unrelated landlord. (See DX 3 for the 575 Fifth Avenue and 27-50 and 27-02 First Street leases.)

22. In or around 2010/2011, Navillus also occupied property at 29-01 Review Avenue which was owned by Borden LIC Properties LLC. Beginning in January 2012, HDK leased property adjacent to Navillus' on Review Avenue from Borden LIC Properties LLC. Navillus and HDK had their own separate lot and the lots were separated by a ten-foot fence that was installed by HDK.

23. Navillus also leased and used property (from an unrelated third-party) at 40 Jernee Mill Road in Sayreville, New Jersey beginning in 2012. Navillus used this property to

-6-

bridging and scaffolding because we had just finished a large job. Time Square paid $42,000 for these materials, the fair market value assessed by Navillus' purchasing department. (See DX 42 for copies of the checks paid to Navillus, and DX 169 for the invoices to Time Square for the scaffolding.)

30. To place these three discrete transactions into perspective, Navillus currently owns millions worth of construction equipment, including a fleet of over 23 vehicles, 6 forklifts, several trailers, and hundreds of thousands of dollars of scaffolding.

### ACS's Formation

31. I had no involvement in the formation of ACS. I learned during this litigation that Moriarty used Helen O'Sullivan's Navillus credit card to pay the filing and publication fees for ACS. I believe my Navillus email address was linked to Helen's Navillus credit card and that is why my email address, pnaughton@navillusinc.com, is listed on initial paperwork for ACS, but I can't be certain.

Dated: 7/7/17

PADRAIG NAUGHTON

NAVILLUS_000091973